## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GERRY BILLY,**

    Plaintiff,

    vs.                           **No. 2:13-CV-0032 MCA/LAM**

**THE CURRY COUNTY BOARD OF
COUNTY COMMISSIONERS,** a political
sub-division existing under the laws of the State
of New Mexico, and **LANCE PYLE,** Individually
and in his official capacity as County Manager for
the Curry County Board of County Commissioners**,**
**ROBERT SANDOVAL**, Individually, **FRANK
BLACKBURN**, Individually, **BEN MCDANIEL**,
Individually, and **TIM ASHLEY, Individually**,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment* [Doc. 74]. Having considered the parties' submissions, the relevant case law, and otherwise being fully advised in the premises, the Court will grant in part and deny in part Defendants' motion.

## I.    BACKGROUND

The following facts are undisputed for the purpose of the present motion for summary judgment. On January 10, 2012, Plaintiff, Gerry Billy, entered into a written employment contract with Defendant Curry County Board of Commissioners (Commission) to work as a jail administrator for the Curry County Detention Center.

[Doc. 75, Undisputed Fact (UF) #1]  The contract provided, in relevant part, that "[a]s the Administrator, Billy shall be solely responsible for the day to day operations of both the Curry County Adult and Juvenile Detention Facilities."  [Doc. 75-1 at 1; Ex. 1A]  The contract further provided, in relevant part, as follows:

> 2)  As Detention Center Administrator, Billy shall be an exempt employee subject only to the terms of this contract. All County policies, except for Sections 3, 4, 5, 6(a), 6(b), 7, 8, 9(g), 10(l), 10(m) and 10(q) of the Curry County Personnel Policy, unless otherwise specifically exempted by the Curry County Board of County Commissioners, shall apply to Billy. . . .
>
> 3)  As the Detention Center Administrator, Billy shall report directly to the Curry County Commission for the purposes of the operation and/or management of the Detention Facilities and/or implementation of the terms of this contract.  Pursuant to the New Mexico Open Meetings Act, Section 10-15-1, et seq, NMSA, 2008, all instructional contact between Billy and the County Commission or contact for the purpose of directing any action, shall be in a public meeting as required by the Act.
>
> For the purpose of personnel matters (excluding his own), procurement issues, budgetary issues, routine maintenance, litigation, tort claims notices, and public records requests, Billy is authorized to deal directly with County Administration.
>
> * * *
>
> 14)  In consideration for the services set forth hereinabove, County shall pay Billy eighty-four thousand dollars ($84,000) commencing on the date of employment.  The Board of County Commissioners of Curry County shall evaluate and provide Billy with any deficiencies or areas of weakness in the overall performance of his duties and responsibilities under this contract every six (6) months and, if performance expectations and goals are satisfactorily met, the County Commission will authorize a raise in six months and every six

months thereafter to raise his salary to a maximum salary as posted of $90,000 within two years of being hired.

\* \* \*

16)     The term of this agreement shall be one (1) year, commencing on February 1, 2012 and running through midnight January 31, 2013.  In the event Billy is terminated by County prior to January 31, 2013, unless Billy is convicted of a felony or otherwise terminated for cause, County shall pay Billy the full amount remaining under this one-year contract.  Cause, for purposes of this contract, shall be defined as the continual (more than once) failure of Billy to comply with the terms of this agreement or, Billy's failure to comply with any material term of this contract.

Unless altered by the Curry County Commission in a public meeting, and set forth in a subsequent written document, or unless notice of termination by the County commission is given to Billy, prior to January 31, 2013, this contract shall be extended for an additional one (1) year period to run from February 1, 2013 through January 1, 2014.  Thereafter, unless altered by written document or unless notice of termination by the County Commission is given to Billy by the first regular Commission Meeting in January of 2013 that it intends to terminate this agreement, this contract shall be extended for an additional one (1) year period to run from February 1, 2014 through January 31, 2015.

Any notice of termination by Billy must be provided in writing to the Chairman of the Curry County Board of County Commissioners and must be provided to the Commission at least thirty (30) days prior to any actual date that Billy will terminate his services for and/or on behalf of County pursuant to this contract.

17)     Billy understands that an express provision of any continued employment with Curry County beyond 2013 is dependent on progress being demonstrated in the overall operation of the Curry County Adult and Juvenile Detention Centers.

18)     This written document reflects the full extent of the contract and agreement by and between the parties.  Any and all prior agreements, discussions, his promises and/or

3

> assurances are merged into this document.  This document
> cannot be changed or altered unless in writing, and signed by
> the County and Billy.

[Doc. 75-1, Ex. 1A]

At the time of Plaintiff's hiring, the Commission consisted of Wendell Bostwick, Caleb Chandler, Dan Stoddard, Bobby Sandoval, and Frank Blackburn.  [Doc. 75, UF #10]  Pursuant to his contract, Plaintiff was evaluated after six months of employment.  [Doc. 75, UF #14]  Commissioners Sandoval and Blackburn did not give Plaintiff glowing praise during the evaluation process.  [Doc. 75 UF #15]  Nevertheless, six months into Plaintiff's employment, the Commission voted to give Plaintiff a raise.  [Doc. 75, UF #16]

In November, 2012, an election took place, resulting in the election of two new Commission members, Defendants Tim Ashley and Ben McDaniel.  [Doc. 75, UF #17]  Effective January 1, 2013, the new Commission consisted of Wendell Bostwick, Bobby Sandoval, Frank Blackburn, Tim Ashley and Ben McDaniel.  [Doc. 75, UF #18]  On January 8, 2013, during the first regularly scheduled Commission meeting of the new year, Commissioner Blackburn, the new chairman of the Commission, made the following motion:

> I move that the contract with Mr. Billy be terminated pursuant
> to Paragraph 16, effective January 31, 2013.  My motion is
> that Mr. Billy immediately be removed from the Detention
> Center, that he be escorted to the Detention Center with a
> deputy, allowed to remove his items of personal property, and
> at that time he will return the keys and any and all other
> County property to the County.  The County will pay Mr.
> Billy the full amount due to him under the contract through
> January 31, 2013.  Until a new Detention Center

> Administrator can be hired, the County Manager will work
> with the Sheriff's Office to handle the administration of the
> Adult Detention Center and Juvenile Detention Center.

[Doc. 75, UF #19]  The motion passed and Plaintiff's employment was terminated on January 8, 2013.[1]  [Doc. 75, Fact # 20]  However, Plaintiff was paid through January 31, 2013. [Doc. 75, Fact # 21]

On February 10, 2013, Plaintiff filed his *First Amended Complaint* against the Commission, Lance Pyle, the Curry County Manager, and the following individual Commission members:  Robert Sandoval, Frank Blackburn, Ben McDaniel, and Tim Ashley (hereinafter collectively referred to as "Defendants").  [Doc. 10]  Plaintiff's *First Amended Complaint* raises the following claims: (1) deprivation of a due process property interest in violation of 42 U.S.C. § 1983; (2) violation of the equal protection clause of the United States Constitution; (3) deprivation of a due process liberty interest in violation of 42 U.S.C. § 1983; (4) violation of the First Amendment of the United States Constitution; (5) breach of contract; (6) retaliatory discharge; (7) interference with contractual relations; and (8) violation of the Whistleblower Protection Act, NMSA 1978, § 10-16C-1.  [Doc. 10]

On October 30, 2013, Defendants filed *Defendants' Motion to Dismiss* [Doc. 61] requesting that the Court dismiss Plaintiff's equal protection, retaliatory discharge, and interference with contractual relations claims.  The Court has entered a separate

---

[1] Plaintiff does not dispute that his employment was terminated on January 8, 2013 or that he was paid through January 31, 2013.  However, in *Plaintiff Gerry Billy's Response Memorandum in Opposition to "Defendants' Motion for Summary Judgment"* [Doc. 79], Plaintiff disputes the propriety of the termination, arguing that "[n]o notice was given to Mr. Billy as required by paragraph 16 of the contract" and "Mr. Billy was entitled to all the protections of a Curry County employee including good cause and prior notice before being terminated."  [Doc. 79 at 7]

*Memorandum Opinion and Order* granting Defendants' Motion to Dismiss.

On December 23, 2013, Defendants filed *Defendants' Motion for Summary Judgment*. [Doc. 74]  Defendants contend that they are entitled to summary judgment on Plaintiff's claims, because: (1) pursuant to the plain language of the employment contract, Plaintiff's employment was for a one year term and Plaintiff was exempted from the pertinent portions of the Curry County Personnel Policy and, therefore, Plaintiff's breach of contract claim must fail; (2) Plaintiff did not have a due process property interest in continued employment, since he "did not have a legitimate expectation that his employment would continue beyond the one-year term of his employment contract" [Doc. 75 at 14]; (3) Defendants' statements did not deprive Plaintiff of a due process liberty interest because they did not impair Plaintiff's reputation, were not made in the course of his termination, and did not foreclose any identifiable employment opportunities; (4) Plaintiff's statements were not protected by the First Amendment because they were made pursuant to his employment responsibilities and did not address matters of public concern; (5) Plaintiff's Whistleblower Protection Act claim must fail because Plaintiff's comments do not constitute "communications about an action or a failure to act," did not address matters of public concern, and did not address an "unlawful or improper act" as defined by the Act.  [Doc. 75 at 27]

On February 20, 2014, Defendants filed *Defendants' Motion to Strike*, which seeks to strike paragraphs 27, 28, and 46 of Plaintiff's affidavit and paragraphs 2 and 6 of Dan Stoddard's affidavit, which were submitted in response to the motion for summary judgment.  [Doc. 142]  The Court has entered a separate *Memorandum Opinion and*

*Order* granting in part and denying in part Defendants' motion.  Consistent with the Court's *Memorandum Opinion and Order*, the following analysis will disregard paragraphs 2 and 6 of Dan Stoddard's affidavit, as well as a portion of paragraph 46 of Plaintiff's affidavit.

## II.   <u>STANDARD</u>

Summary judgment under Fed.R.Civ.P. 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. " Fed.R.Civ.P. 56(a).  When a motion for summary judgment is made and supported as provided in this rule, the adverse party must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Lopez v. LeMaster</u>, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  <u>See Celotex</u>, 477 U.S. at 324.  It is not the court's role, however, to weigh the evidence, assess the credibility of

witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather,

the Court assumes the evidence of the non-moving party to be true, resolves all doubts

against the moving party, construes all evidence in the light most favorable to the non-

moving party, and draws all reasonable inferences in the non-moving party's favor.  See

Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**III.   DISCUSSION**

*A.*    *Breach of Contract*

Defendants contend that they are entitled to summary judgment because, pursuant

to the plain terms of the employment contract, Plaintiff could be terminated without good

cause so long as he was paid through the end of his one-year term of employment.  [Doc.

75 at 13]  Defendants further contend that they are entitled to summary judgment

because, pursuant to the plain language of the contract, Plaintiff was exempt from the

terms of the Curry County Personnel Policy.  In response, Plaintiff argues that questions

of material fact preclude summary judgment because an e-mail communication from Mr.

Pyle and the minutes from the January 10, 2012 Commission meeting led him to believe

that "as long as performance goals were being met he would continue his employment

with Curry County through 2015."  [Doc. 79 at 31]  Furthermore, Plaintiff argues that his

contract was modified by the Commission on March 20, 2012, when the Commission

voted to apply the Curry County Personnel Policy to all county employees except the

Under-sheriff and Executive Assistant.  [Doc. 79 at 31]

*1.*    *Term of Employment*

The New Mexico Supreme Court has held that "even if the language of the

contract appears to be clear and unambiguous, 'a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing and course of performance,' in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V, Inc. v. Mellekas, 845 P.2d 1232, 1235 (N.M. 1993) (quoting C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508-09 (N.M. 1991)). Thus, "[t]he court is no longer restricted to the bare words of the agreement in interpreting the intent of the parties to a contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous." Id.

"An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Id. "The question of whether an agreement contains an ambiguity is a matter of law to be decided by the trial court." Id. "If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Id. "If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." Id. "At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." Id.

Plaintiff relies on two documents to support his claim that a question of fact exists regarding the length of his contractual term of employment. First, Plaintiff relies on an e-mail dated December 19, 2011 from Mr. Pyle to "Steve", which was carbon copied to Plaintiff. In the e-mail Mr. Pyle delineates the contractual terms of employment, in

relevant part, as follows:

> If performance goals are met and raise will be given in six (6) months and then yearly with being at the maximum salary ($90,000) within two (2) years of being hired.

> * * *

> Automatic Renewal similar to Keith Norwood.

> Start Date – February 1, 2012

[Doc. 81, Ex. 1A]  Second, Plaintiff relies on the minutes from the January 10, 2012

meeting of the Commission, which provide, in relevant part, as follows:

> Doerr reviewed the terms and conditions of the contract with Gerry Billy, who will serve as the Curry County Detention Administrator.  His salary will be $84,000 commencing on the date of employment February 1, 2012.  If goals, performance, etc. are met the Commission will authorize a raise in six months and every six months thereafter to raise his salary to a maximum salary as posted of $90,000 within two years of being hired.  The term is one year beginning February 1, 2012 through January 31, 2103 with a two-year extension through January 31, 2015.  Commissioner Chandler moved to approve the contract with Gerry Billy as the Curry County Detention Administrator.  Stoddard 2nd.  Roll call vote.  Chandlyer aye, Sandoval aye, Blackburn aye, and Bostwick aye.  By a 5-0 vote the motion carried.

[Doc. 85 at 2, Ex. 1E]

The Court concludes that nothing in the December 19, 2011 e-mail nor the January

10, 2012 Commission minutes render the language of the employment contract

ambiguous.  Indeed, both the minutes and the contract explicitly state that the contractual

term of employment is one year, commencing on February 1, 2012 and ending on

January 31, 2013.  Although Plaintiff's raise was dependent upon his achievement of

performance goals, there is nothing in the e-mail, the minutes, nor his employment

agreement to suggest that the one year contractual term of employment would be extended if performance goals were met.  Additionally, consistent with the e-mail and the minutes, Plaintiff's contract provided for automatic renewal, absent notice of termination by the Commission or by Plaintiff prior to January 31, 2013.  However, Plaintiff was terminated by the Commission prior to January 31, 2013, before the automatic renewal of the contract went into effect.  Because the contract plainly and unambiguously provides for a "one (1) year" employment period "commencing on February 1, 2012 and running through midnight January 31, 2013," [Doc. 75-1, Ex. 1A]  Plaintiff's argument that a question of fact exists regarding the length of his contractual term of employment is rejected.

2.      *Curry County Personnel Policy*

Plaintiff's employment contract plainly states that Plaintiff is an "exempt employee, subject only to the terms of this contract.  All County policies, except for Sections 3, 4, 5, 6(a), 6(b), 7, 8, 9(g), 10(l), 10(m) and (q) of the Curry County Personnel Policy, unless otherwise specifically exempted by the Curry County Board of County Commissioners shall apply to Billy."  [Doc. 75-1, Ex. 1A]  Thus, Plaintiff was exempt from Section 7 of the Personnel Policy regarding "Employee Discipline" and Section 8 of the Personnel Policy regarding "Grievance Procedures."  [Doc. 144-1, Ex. 1]  Plaintiff does not dispute that, pursuant to the plain language of the contract, he was exempt from the relevant provisions of the Curry County Personnel Policy.  Rather, Plaintiff contends that "the Commission at its March 20th, 2012 public meeting changed that provision in Mr. Billy's contract by voting to apply the entire personnel policy to all county

11

employees with the exception of the Under-sheriff and Executive Assistant." [Doc. 79 at 31]

The minutes of the March 20, 2012 meeting of the Commission provide, in relevant part, as follows:

> 5.      Request Approval of Curry County Organizational Chart (Chain of Command) – Lance A. Pyle
>
> The last organizational chart was adopted December 5, 2000. The solid line on the chart indicates direct supervision and the dotted line indicates indirect supervision.  The dotted line will be moved below the Under-sheriff and Executive Assistant in the Sheriff's Office as they are exempt from the personnel policy.  Doerr stated the entire personnel policy applies to all county employees with the exception of the Under-sheriff and Executive Assistant.
>
> Motion made to approve the organizational chart as amended.

[Doc. 87 at 2, Ex. G]  The motion passed unanimously.  [Id.]

To resolve this claim, the Court turns to Chavez v. Manville Products Corp., 777 P.2d 371 (N.M. 1989).  In Chavez, the plaintiff, Severo Chavez, had a written at-will employment agreement that provided, in relevant part, as follows:

> It is further agreed that as a condition of said employment, no modification of any of the terms of this employment agreement shall be of any force or effect *unless such modification shall be in writing.*

Id. at 373 (emphasis in original).  Nonetheless, the plaintiff contended that subsequent oral representations from his employer, Manville Products Corporation, modified his written employment agreement.  The New Mexico Supreme Court rejected this argument, holding as follows:

> New Mexico recognizes an exception to at-will employment when the words and conduct of the parties give rise to an implied employment contract. Forrester v. Parker, 93 N.M. 781, 606 P.2d 191 (1980) (implied contract based upon provisions of employee handbook); Kestenbaum v. Pennzoil Co., 108 N.M. 20, 766 P.2d 280 (1988) (oral statements made by an employer may be sufficient to create an implied contract), cert. denied, 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989). However, we are of the opinion that the alleged oral representations made to Chavez in 1973 cannot create enforceable contractual obligations in the face of the provision in the 1965 agreement that any modification of the employment agreement must be in writing. As a matter of law, this provision precluded Manville's oral assent to modification of its contractual relationship with Chavez. It also precludes the possibility that any reliance by Chavez on the alleged representations was reasonable.

Id. at 373-74; see also Bd. of Educ., Gadsden Indep. Sch. Dist. No. 16 v. James Hamilton Const. Co., 891 P.2d 556, 562-63 (N.M. App. 1994) ("Where the contract requires that any modification be in writing, oral modifications are ineffectual.").

Plaintiff's employment contract plainly provides that the provisions therein "cannot be changed or altered unless in writing, and signed by the County and Billy." [Doc. 75-1, Ex. 1A]  There is no evidence that the March 20, 2012 vote of the Commission was ever reduced to writing and signed by both the County and Billy. Accordingly, pursuant to Chavez, the Court concludes that the alleged modification failed "as a matter of law."  Id.  Therefore, Plaintiff's claim that he was subject to the provisions of the Curry County Personnel Policy is rejected.

Plaintiff was terminated on January 8, 2013, approximately three weeks before the expiration of his one year contractual term of employment.  However, consistent with the terms of his employment contract, Plaintiff was paid through January 31, 2013.  Because

there are no genuine issues of material fact with respect to whether Defendants breached the employment contract, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's breach of contract claim.

B.     *Due Process Property Interest*

The Fourteenth Amendment protects citizens from the deprivation of "life, liberty, or property, without due process of law. . . ." U.S. Const. amend. XIV, § 1.  "To determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir.1998).  In this case, it is undisputed that Plaintiff was not afforded any process prior to the termination of his employment.  Therefore, resolution of Plaintiff's due process claim hinges on the first factor, namely, whether he had a protected property interest in continued employment.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).  The Court must "look to state law to determine whether a property interest exists." Gonzales v. City of Albuquerque, 701 F.3d 1267, 1271 (10th Cir. 2012). "Under New Mexico law, a public employee has a protected property interest only if he has an express or implied right to continued employment." Id. (internal quotation marks and citation omitted).

14

In this case, Plaintiff's employment relationship was governed by an express employment agreement.  As explained above, the employment agreement guaranteed Plaintiff's employment for only one year, from February 1, 2012 through January 31, 2013.  Therefore, Plaintiff did not have a legitimate claim of entitlement to employment beyond January 31, 2013.  See Martin v. Unified School Dist. No. 434, 728 F.2d 453, 455 (10th Cir. 1984) (holding that the plaintiff did not have a legitimate expectancy of continued employment, even though his one-year employment contract previously had been renewed eleven times).

However, it is undisputed that Plaintiff's employment was terminated on January 8, 2013, approximately three weeks prior to the expiration of his one year term of employment.  Plaintiff was paid through January 31, 2013, but the question arises as to whether he had a property interest in continued employment as a jail administrator for the final three weeks of his contractual term.  Board of Education of Carlsbad Municipal Schools v. Harrell, 882 P.2d 511 (N.M. 1994) is instructive on this point.  In Harrell, the plaintiff was suspended from his position as school district superintendent on January 17, 1990, but he continued to receive his salary until his employment was terminated on March 12, 1990.  Id. at 518.  The plaintiff contended that his suspension deprived him of his due process property interest in continued employment.  The Supreme Court of New Mexico rejected this claim, holding that the plaintiff's contract "afforded him only the right to be fully compensated; he had no right to occupy the office of superintendent." Id. (citing Royster v. Board of Trustees, 774 F.2d 618, 621 (4th Cir. 1985) (holding that property interest in continued expectation of public employment does not include right to

15

actually occupy position), <u>cert. denied</u>, 475 U.S. 1121 (1986)).  Therefore, the plaintiff's

"claim of entitlement to employment was satisfied so long as he continued to receive the

full compensation due under his contract."  <u>Id.</u>; <u>see also Pitts v. Bd. of Educ. U.S.D. 305</u>,

869 F.2d 555, 556 (10th Cir. 1989) (holding that a suspension with pay does not deprive

an employee of "any measurable property interest"); <u>Pierce v. Engle, Jr.</u>, 726 F. Supp.

1231, 1237 (D. Kan. 1989) (holding that the plaintiff had not been deprived of a due

process property interest because she continued to receive her salary).

It is undisputed that Plaintiff received full compensation for his one-year

contractual term of employment.  <u>See</u> footnote 1.  Accordingly, the Court will grant

Defendants' motion for summary judgment on Plaintiff's due process property interest

claim.

<u>C.</u>      *Due Process Liberty Interest*

An employee has a "liberty interest in his good name and reputation as it affects

his protected property interest in continued employment."  <u>Workman v. Jordan</u>, 32 F.3d

475, 480 (10th Cir.1994).  However, "[d]efamation, standing alone, [is] not sufficient to

establish a claim for deprivation of a liberty interest.  [T]he defamation [has] to occur in

the course of the termination of employment."  <u>Renaud v. Wyoming Dep't of Family</u>

<u>Serv.</u>, 203 F.3d 723, 726-27 (10th Cir. 2000) (quoting <u>Paul v. Davis</u>, 424 U.S. 693, 710

(1976)).  To establish the deprivation of a liberty interest, an employee must satisfy the

four-part test delineated by the Tenth Circuit Court of Appeals in <u>Workman</u>:

> First, to be actionable, the statements must impugn the good
> name, reputation, honor, or integrity of the employee.
> Second, the statements must be false.  Third, the statements

16

> must occur in the course of terminating the employee or must
> foreclose other employment opportunities.  And fourth, the
> statements must be published.

Workman, 32 F.3d at 481 (citations omitted).  "These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest."  Id.

"At first blush, it appears that [the third factor] can be met either by statements made in the course of terminating an employee or, in the alternative, by any other statements that might foreclose other employment opportunities."  Renaud, 203 F.3d at 728 n.1.  However, our Circuit has clarified that the "Workman court did not intend to create a test under which a liberty interest might be infringed by any defamatory statement that might foreclose future employment opportunities."  Id.  The United States Supreme Court "confirmed [this] interpretation in Siegert v. Gilley, 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), finding the former employee of a government hospital could not bring a stigma-plus claim against an ex-supervisor" because "'[t]he alleged defamation was not uttered incident to the termination of [his] employment.'"  Guttman v. Khalsa, 669 F.3d 1101, 1126 (10th Cir. 2012).  Accordingly, under the third factor, the alleged defamatory statements do not deprive the employee of a liberty interest unless they are made during the course of termination.  See id.

In Renaud, our Circuit determined that "defamatory statements need not be strictly contemporaneous with a termination to occur in the course of employment."  Renaud, 203 F.3d at 727.  Rather, the Court adopted "the Ninth Circuit's common-sense approach examining the nature of the alleged defamation, as well as its timing, to determine whether it occurred in the course of termination."  Id.  "Roughly contemporaneous

statements about the reasons for termination are not the same as roughly contemporaneous statements on other matters.  What is relevant to our analysis is the manner in which a public employee is terminated . . . and the statements made incident to the termination." Id. (internal quotation marks and citation omitted).  Therefore, a court "must examine both the nature and the timing of an allegedly defamatory statement to determine whether it has been made in the course of an employee's termination." Id.

Plaintiff contends that the following allegedly defamatory statements made by Commissioner Sandoval at a public meeting of the Commission held on January 25, 2013 deprived him of his due process liberty interest in his good name and reputation: (1) that the glass in Pods 1 and 2 had been shattered for approximately 9 months; (2) that "our jail system is broken badly and he has never seen it as bad as it is right now"; and (3) that "the Commission had given the directive months ago for the cleaning supplies to be locked up and extension cords taken out of the halls as well as putting up metal detectors." [Doc. 79 at 33; see Doc. 144-7 at 2, Ex. 7]  Additionally, Plaintiff contends that his reputation was damaged when he was "publicly humiliated by being immediately escorted out of the Commission meeting and then Detention Center by a Sheriff's Deputy." [Doc. 79 at 33]  Lastly, Plaintiff relies on an editorial published in the Clovis News Journal on January 8, 2013, in which the author states that the vote of Commissioners Ashley and McDaniel to terminate Plaintiff's employment "recognized the inept, even dangerous lack of leadership coming from the jail." [Doc. 79 at 33, Doc. 108 at 1, Ex. 1BB]  Defendants respond that Commissioner Sandoval's statements are not actionable because they did not injure Plaintiff's reputation and they were not made

during the course of Plaintiff's termination.  [Doc. 144 at 45-47]  Defendants further respond that escorting Plaintiff from the premises does not support the deprivation of a liberty interest and that the January 8, 2013 editorial expresses the opinions of the editorial author, rather than Commissioners Ashley and McDaniel.

Turning first to Commissioner Sandoval's statements, the Court notes that these statements occurred on January 25, 2013, seventeen days after the termination of Plaintiff's employment on January 8th.  Pursuant to Renaud, the Court must examine "the nature and the timing of the allegedly defamatory statement to determine whether it has been made in the course of an employee's termination."  Renaud, 203 F.3d at 727. Commissioner Sandoval's comments do not mention Plaintiff or the termination of his employment.  Rather, the comments were made during a "Detention Center Update" and were part of a discussion of the then current state of affairs at the Curry County Detention Center.  [Doc. 111, Ex. 1EE]  Because Commissioner Sandoval's comments were not about Plaintiff or the manner or reason for his termination, the Court concludes that they were not made during the course of Plaintiff's termination for the purposes of the third Workman factor.  See id. (holding that statements made several days following the plaintiff's termination from employment were not made during the course of plaintiff's termination because they "had nothing to do with the reasons for the termination"); c.f. Bjorklund v. Miller, 467 Fed.Appx. 758, 769 (10th Cir. 2012) (holding that the defendant's statements were made during the course of the plaintiff's termination because they "essentially involved [the plaintiff's] defense against or attempt to mitigate the charges against him that were asserted during the pre-termination hearing") (unpublished

opinion).

Regardless, at most, Commissioner Sandoval's comments may be construed to indicate that Plaintiff was negligent and neglectful of his duties as jail administrator. It is well established that although "charges involving negligence and neglect of duties . . . could give rise to a state law defamation claim, they are insufficient to establish a liberty interest deprivation." Se. Kansas Comty Action Program Inc. v. Sec'y of Agric. of the United States, 967 F.2d 1452, 1458 (10th Cir. 1992); see also Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) (holding that "[t]he reasons for [the plaintiff's] discharge, neglect of duties and insubordination, even when considered false, do not call into question his good name, reputation, honor, or integrity" and, therefore, do not support a deprivation of liberty interest claim); Sullivan v. Stark, 808 F.2d 737, 739 (10th Cir. 1987) (holding that the defendants' complaints that the plaintiff was "negligent or derelict in performing the duties of a park ranger . . . do not implicate concerns of constitutional stature"). Because Commissioner Sandoval's comments "do not call into question [Plaintiff's] good name, reputation, honor, or integrity," Conaway, 853 F.2d at 794, they are insufficient to establish a liberty interest deprivation.

Next, the Court addresses whether Plaintiff's due process liberty interest was violated when he was escorted off the premises after his January 8, 2013 termination. Notably, Plaintiff does not rely on Defendants' allegedly false statements, but rather on Defendants' *conduct*. Plaintiff contends that this conduct (i.e., escorting Plaintiff off the premises) falsely "implied that Mr. Billy had done something illegal, dishonest, or threatening to the safety of the Detention Center" and thereby injured his reputation.

20

[Doc. 79 at 33]  The Tenth Circuit Court of Appeals has not addressed the question of whether conduct alone can support a due process liberty interest claim.  However, in O'Connor v. Pierson, 426 F.3d 187, 195 (2d Cir. 2005), the Second Circuit Court of Appeals concluded that conduct alone, in the absence of a false and stigmatizing statement, is insufficient to establish the deprivation of a due process liberty interest.  In that case, the plaintiff teacher alleged that his "liberty interest in his reputation was infringed by the Board" when he was placed on sick leave, investigated, and forced to see a psychiatrist.  The Second Circuit rejected the plaintiff's claim because the plaintiff had failed to allege that the defendants had made any false or stigmatizing statements.  The Court explained as follows:

> Both [the plaintiff's] complaint and his brief on appeal posit that his stigma arose from the Board's actions, not from its statements.  In effect, [the plaintiff] has alleged the plus without the stigma, and argues that the plus alone has created the stigma.  Even if [the plaintiff] is correct that townsfolk drew negative inferences from his suspension, this is not enough to make out a stigma-plus claim.  The district court properly granted summary judgment in the Board's favor on this claim.

Id. at 195-96.  (footnote omitted).  Based on O'Connor, the District Court for the District of Connecticut has rejected the contention that suspending a plaintiff, escorting him from the property, and eliminating his position can support a stigma-plus claim.  See Leichter v. Lebanon Bd. of Educ., 917 F.Supp.2d 177, 190-191 (D. Conn. 2013).  Consistent with O'Connor and Leichter, the Court concludes that the Commission's conduct in ordering Plaintiff to be escorted off the premises, standing alone, is insufficient to establish the deprivation of a due process liberty interest.

Lastly, Plaintiff relies on a January 8, 2013 editorial in the Clovis News Journal in support of his due process liberty interest claim.  The editorial provides, in relevant part, as follows:

> The first question for new Curry County Commissioners Tim Ashley and Ben McDaniel is why did it take two hours into their first board meeting before they fired jail administrator Gerry Billy.
>
> The question is tongue in cheek, of course.
>
> They joined holdover Commissioners Bobby Sandoval and Frank Blackburn in a 4-1 vote Tuesday morning to fire Billy. Commissioner Wendell Bostwick cast the lone dissenting vote.
>
> Elected last November, Ashley and McDaniel recognized the inept, even dangerous lack of leadership coming from the jail. Blackburn and Sandoval had been critics of Billy's management much of his 11 months on the job.

[Doc. 108, Ex. 1BB]  The unsigned editorial does not quote Defendants or purport to represent the opinions of Defendants.  Rather, the unsigned editorial states that it represents "the opinion of the Clovis Media Inc. editorial board, which includes Publisher Ray Sullivan and Editor David Stevens."  [Doc. 108, Ex. 1BB]  Because there is no evidence that the statement regarding Plaintiff's "inept, even dangerous lack of leadership" was made by Defendants, the unsigned editorial does not support Plaintiff's due process liberty interest claim.

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's due process liberty interest claim will be granted.

D.      _First Amendment Retaliation_

Plaintiff contends that he was terminated from his employment in retaliation for

engaging in speech protected by the First Amendment of the United States Constitution.
Plaintiff's claim is premised on the following instances of allegedly protected speech: (1)
Plaintiff's objection, at a December 5, 2012 meeting of the Commissioners, to the
adoption of the Chaves County Detention Manual; (2) Plaintiff's objection to being
placed under the supervision of Mr. Pyle; (3) Plaintiff's request for a public investigation
into Commissioner Sandoval's statements regarding an alleged cover up of an assault and
battery of an inmate at the Detention Center; (4) Plaintiff's publicly expressed concerns
about the large population of Hispanic surnamed inmates at the Detention Center; (5)
Plaintiff's attempts to address overcrowding at the Detention Center; and (6) Plaintiff's
request for a study to determine whether the Detention Center was suffering from "sick
building syndrome." [Doc. 10 at 7-8] Defendants move for summary judgment on
Plaintiff's retaliatory discharge claim, contending that Plaintiff's statements were not
protected by the First Amendment because they were made pursuant to his official
employment duties and/or did not address matters of public concern. [Doc. 75 at 20-27]

"When a citizen enters government service, the citizen by necessity must accept
certain limitations on his or her freedom." Garcetti v. Ceballos, 547 U.S. 410, 418
(2006). At the same time, however, "[t]he First Amendment limits the ability of a public
employer to leverage the employment relationship to restrict, incidentally or
intentionally, the liberties employees enjoy in their capacities as private citizens." Id. at
419. "So long as employees are speaking as citizens about matters of public concern,
they must face only those speech restrictions that are necessary for their employers to
operate efficiently and effectively." Id.

The Tenth Circuit Court of Appeals has adopted the following five-prong test to determine whether a public employee's First Amendment right to freedom of speech has been violated:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

Dixon v. Kirkpatrick, 553 F.3d 1294, 1302 (10th Cir. 2009).  "The first three 'prongs; are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder."  Id.

The parties' briefs focus on the first two prongs, namely, whether Plaintiff's speech was made pursuant to Plaintiff's official duties and whether the speech was on a matter of public concern.

*1.*     *Official Duties*

It is well established that "speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation."  Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1203 (10th Cir. 2007).  The Tenth Circuit's "precedents have taken a broad view of the meaning of speech that is pursuant to an employee's official duties."  Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 713 (10th Cir. 2010) (internal quotation marks and citation omitted).  The Circuit has eschewed "bright line rules" and emphasized that "no one factor is

dispositive." Id.  Speech may be made pursuant to an employee's official duties even if it "concerns an unusual aspect of an employee's job that is not part of his everyday functions."  Brammer-Hoelter, 492 F.3d at 1203.  Indeed, the Tenth Circuit Court of Appeals has stated that "speech is made pursuant to official duties if it is generally consistent with the type of activities [the employee] was paid to do."  Id. (internal quotation marks and citation omitted).  "Stated another way, if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duty."  Chavez-Rodriguez, 596 F.3d at 713; see id. (holding that the comments the plaintiff made to Ben Lujan, Speaker of the New Mexico House of Representatives, during a Volunteer Appreciation Banquet conducted during work hours were made in the course her official duties as Director of the City of Santa Fe's Division of Senior Services); see also Rohrbough v. Univ. of Colorado, 596 F.3d 741 (10th Cir. 2010) (holding that the plaintiff's internal communications regarding an alleged staffing crisis, occurrence reports, and heart misallocation were all made during the course of her official duties as a Transplant Coordinator at the defendant hospital); Green v. Bd. of County Commissioners, 472 F.3d 794, 800-801 (10th Cir. 2007) (holding that the plaintiff's speech regarding confirmation drug testing was made in the course of her duties as a drug-lab technician and detention officer).

*i.*        *Objection to Chaves County Jail Policies*

    The Court first addresses whether Plaintiff's objections to the adoption of the Chaves County Jail policies were made in the course of his official duties. The record

reflects that at a December 18, 2012 open meeting of the Commission, Plaintiff

"criticized the wholesale adoption of Chaves County jail policies in Curry County."

[Doc. 79 at 22, AMF #22; see Doc. 104, Ex. X]  As Detention Center Administrator,

Plaintiff was required to report to the Commission in public meetings "for the purposes of

the operation and/or management of the Detention Facilities."  [Doc. 75-1 at 6]  Plaintiff

was also required to work toward the accreditation of the Curry County Detention

Facilities and to ensure that the facilities "are brought into compliance with known and

accepted standards."  [Id.]  During his deposition, the following colloquy took place

between Plaintiff and opposing counsel regarding the adoption of the Chaves County Jail

policies:

> Q.     Your comments at – to the county commission, those
> were made at their public meeting, correct?
>
> A.     That's correct.
>
> Q.     And I believe it is contained in your contract that you
> are to answer and to report to the county commission on
> whatever issues involve the jail in the content of their public
> meetings; is that right?
>
> A.     That's correct.
>
> Q.     And you making comments upon the adoption of
> policies concerning the jail, those comments would be made
> as part of your official duties as the jail administrator; is that
> correct?
>
> A.     That would be correct.
>
> Q.     And the adoption of the Chaves County Detention
> Center policies, it would be fair to say, would it not, that that
> dealt with affairs or circumstances pertinent and peculiar to
> the detention center, right?
>
> A.     They were specific to the detention center, yes.

Q.      And it dealt with the adoption or non-adoption or the decision to adopt policies that applied directly to the detention center?

A.      Yes.  Embracing another county's policy and procedure, yes.

Q.      And your comments upon those detention center – the adoption of those detention center policies, those would be related to issues within your employment and responsibilities since you're the jail administrator, right?

A.      That's correct.

[Doc. 75-2 at 7-8]  The Court concludes that Plaintiff's comments on the adoption of the Chaves County Jail Policies "contribute[d] to or facilitate[d]," Chavez-Rodriguez, 596 F.3d at 713, his performance as Detention Center Administrator and, therefore, were made during the course of his official duties.

*ii.*      *Objection to the Supervision of Mr. Pyle*

The Court next addresses Plaintiff's objections to being placed under the supervision of Mr. Pyle.  The following additional facts are necessary to resolve this claim.  Pursuant to the terms of Plaintiff's employment contract, Plaintiff was to "report directly to the Curry County Commission for the purposes of the operation and/or management of the Detention Facilities and/or implementation of the terms" of his employment contract.  [Doc. 75-1 at 6]  However, "[f]or purposes of personnel matters (excluding his own), procurement issues, budgetary issues, routine maintenance, litigation, tort claims notices, and public records requests, Billy is authorized to deal directly with County Administration."  [Id.]  On December 28, 2012, Plaintiff's attorney sent a letter to the Curry County Attorney, Stephen Doerr, about the "Breach of Contract

by Board of County Commissioners for Curry County." [Doc. 75-7]  The letter provided,

in relevant part, as follows:

> I have been contacted by Mr. Gerry Billy regarding the
> breach of his contracted [sic] entered into on January 10th,
> 2012.  Mr. Billy was hired by the Board of County
> Commissioners with the **express** understanding that he would
> report directly to the Board of County Commissioners.  Mr.
> Billy has been informed that he will at some time in the New
> Year be required to report to Mr. Lance Pyle the County
> Manager.  Mr. Billy left his home in Ohio, and travelled over
> fifteen hundred miles with the express understanding that he
> would have the backing of the County Commission as he
> attempted to turn around the situation existing at the Curry
> County Detention Center.  Mr. Billy is one of an extensive list
> of Administrators in the last 10 years and has done an
> outstanding job as Administrator.
>
> * * *
>
> Demand is hereby on the Curry County Board of
> Commissioners that they either comply with the letter and
> spirit of the contract **immediately** or I will advise Mr. Billy
> of his further legal rights to pursue a claim for breach of
> contract.

[Doc. 75-7, Ex. 7 (Emphasis in original)].  Although the letter from Plaintiff's attorney

pertained to Plaintiff's employment, it does not appear that it was made in the course of

executing Plaintiff's official duties.  See Lane v. Franks, 134 S.Ct. 2369, 2379 (2014)

("The critical question under Garcetti is whether the speech at issue is itself ordinarily

within the scope of an employee's duties, not whether it merely concerns those duties.").

Indeed, Plaintiff procured his own attorney to represent his personal interests and to

object, outside the chain of command, to Defendants' alleged breach of his employment

contract and to threaten litigation.  Under these circumstances, Plaintiff's speech was not

generally "consistent with the type of activities [Plaintiff] was paid to do."  Brammer-

Hoelter, 492 F.3d at 1203; see id. at 1204-05 (holding that the plaintiff teachers'
complaints about the resignation of other teachers, the Academy Code of Conduct's
restrictions on freedom of speech, staffing levels, spending on teacher salaries and
bonuses, criticisms of the school board, visibility of Board members at important events,
lack of support, trust, feedback and communication with a board member, restrictions on
speech and association, treatment of parents by the Board, favoritism, renewal of the
school charter, and upcoming board elections were not made pursuant to their official
duties); see also Thomas v. City of Blanchard, 548 F.3d 1317, 1325 (10th Cir. 2008)
(holding that because the plaintiff "went beyond complaining to his supervisors and
instead threatened to report to the OSBI, an agency outside his chain of command," his
speech was not made pursuant to his official duties).

iii.     *Request for a Public Investigation of Commissioner Sandoval's Comments*

Plaintiff contends that his employment contract was terminated in retaliation for
his request for a public investigation into Commissioner Sandoval's statements regarding
an alleged cover up of an assault and battery of a Detention Center inmate.  The
following additional facts are necessary to resolve this claim.  On June 27, 2012, there
was an altercation between two inmates at the Curry County Detention Center, known as
"the Perez/Guerra incident."  [Doc. 75 MF #11; Doc. 80 at 8]  On August 25, 2012, the
Clovis News Journal published an article about the Perez/Guerra incident and the
subsequent investigation.  [Doc. 75-3, Ex. 3]   The article provides, in relevant part, as
follows:

An email from a Curry County jail captain reports an investigation into a June 27 fight was almost complete by noon on June 29.

A Curry County commissioner wants to know how that's possible if the jail administrator did not request an investigation until at least June 29 as county officials have indicated.

"There's been a huge cover-up," Commissioner Robert Sandoval said after learning of the email from Capt. Keith Farkas to County Manager Lance Pyle.

* * *

Commissioner Sandoval said he has questions for Billy and other County officials.

"How can he (Farkas) be finishing an investigation in response to the tort claim on the day that we are notified of it? Sandoval asked. "It tells me somebody is lying."

[Id.] In response, Plaintiff sent a letter to Commissioner Bostwick dated August 27, 2012, on Curry County Detention Center letterhead, which states:

Dear Chairman Bostwick:

In light of the recent statements made by Commissioner Bobby Sandoval to the local media, and which appeared in print on August 25, 2012, I am calling upon you and the County Commission for an investigation by an independent, New Mexico State Policing Agency into the allegations made by Commissioner Sandoval. Commissioner Sandoval alleges, among other things, that either myself or Captain Keith Farkas orchestrated what he referred to as " . . . a huge cover-up" as it relates to the June, 2012 incident between inmates Louis Guerra and Jamie Perez. An allegation of a cover-up by a government official implies corruption, malfeasance or dishonesty. Sandoval further stated "How can he (Farkas) be finishing an investigation in response to a tort claim on the day that we were notified of it? It tells me somebody is lying."

I find the remarks made by Mr. Sandoval not only patently false, but libelous in context.  If I, or any member of our detention staff, were to have committed such an egregious act, then a thorough investigation of such a matter needs to be conducted.  I ask that the independent policing agency be from an appropriate state agency, and that those agents conducting the inquiry not be from, or have worked in a law enforcement capacity in Curry County.  I also ask that the results of such an investigation be in written form and directed to your attention.

Suffice it to say, I am outraged by the Commissioner's accusations of such weighty ethical and legal improprieties.  This call for action is not just for me, but for Captain Farkas and the entire staff of the Curry County Detention Center.  Our personal and professional reputations have been impugned and I do not take this lightly.

Sincerely,


Gerry D. Billy

Curry County Detention Administrator

[Doc. 102, Ex. IV]

As Detention Center Administrator, Plaintiff was responsible for the management of the Detention Center and its compliance with known and accepted standards.  [Doc. 75-1 at 6]  Additionally, Plaintiff was responsible for "ensur[ing] that all County policies, as they may apply to the Detention Center and/or Detention Personnel, are followed and complied with."  [Id. at 7]  In furtherance of these duties, Plaintiff requested an independent investigation to determine whether anyone at the Detention Center, including himself, "Captain Farkas and the entire staff of the Curry County Detention Center," had engaged in a cover-up of the Perez/Guerra incident.  [Doc. 102]  The official nature of the letter is reinforced by the fact that it was penned on Curry County Detention

Center letterhead, signed by Plaintiff in his official capacity as Curry County Detention Administrator, and directed to the attention of the Chairman of the Commission.  Because Plaintiff's speech was made in the course of executing his official duties, the Court concludes that it was not protected by the First Amendment.

iv.      *Comments Regarding Hispanic Population*

It is undisputed that Plaintiff "publicly questioned why there were so many Hispanics locked up."  [Doc. 79 at 22, AMF #AA]  The details surrounding these comments are unclear, but Plaintiff states in his affidavit that he made comments regarding "the high percentage of Hispanics found in jail when compared with their total population in Curry County" at "public meetings in February and March 2012 regarding the passage of a bond issue for the Detention Center on April 3rd, 2012."  [Doc. 80 at 6] Specifically, Plaintiff "went to . . . public venues to raise public awareness about the new jail addition.  A new jail addition would allow for the adequate classification of inmates and provide special housing units (SHU), for disciplinary, mental health, orientation, protective custody and medical classified prisoners.  A new kitchen and laundry were also part of the proposed addition."  [Id.]  In his affidavit, Plaintiff avers that "[t]hese presentations were not part of my regular duties as Detention Administrator."  [Id.] However, in his deposition, Plaintiff was asked whether "it would be fair to say . . . that keeping track of the population of prisoners in your jail and then sharing that information with the public and commenting upon that would be part of your job duties as jail administrator" and Plaintiff responded "Yes, sir."  [Doc. 75-2 at 11]  Again, Plaintiff was asked "So your comments would have been made in the context of your job duties" and

32

Plaintiff responded "Yes."  [Id.]

As previously explained, speech may be made pursuant to an employee's official duties even if it "concerns an unusual aspect of an employee's job that is not part of his everyday functions."  Brammer-Hoelter, 492 F.3d at 1203.  Chavez-Rodriguez is instructive on this point.  In Chavez-Rodriguez, the plaintiff was the Director of the City of Santa Fe's Division of Senior Services (the Division).  596 F.3d at 710.  The plaintiff objected to proposed cuts to the Division's budget that would have resulted in "cutting certain funding for food services and transferring federal funds from the Division's budget."  Id. at 711.  The Division hosted a Volunteer Appreciation Banquet during work hours, which the plaintiff attended in her role as Director.  One of the attendees was Ben Lujan, Speaker of the House of Representatives and a longtime family friend of the plaintiff.  At the banquet, the plaintiff informed Speaker Lujan of her objection to the proposed budget cuts and their impact on the health and welfare of senior citizens.  The plaintiff claimed that she was fired in retaliation for these comments in violation of her First Amendment right to freedom of speech.  The Tenth Circuit Court of Appeals held that the plaintiff's comments to Speaker Lujan were "made pursuant to her official duties."  Id. at 714.  The Court noted that the event was sponsored by the Division, conducted during work hours, and that both the plaintiff and Speaker Lujan attended the event in their official capacities.  Id.  Furthermore, the Court determined that "[t]he content of the speech indicates the conversation was more akin to a work discussion between two public officials than small talk at a party.  By voicing her budgeting concerns to Lujan, a powerful New Mexico official, [the plaintiff] was engaging in

speech that 'contribute[d] to or facilitate[d]' her performance as Director." Id. (quoting

Brammer-Hoelter, 492 F.3d at 1203). The Court observed that the plaintiff's "speech at

the banquet can be likened to lobbying a government official to support the Division's

needs and concerns in light of the budget crisis. Even if not an explicit job requirement,

the record indicates the discussion with Lujan stemmed from [the plaintiff's] duties as

Director and were of the type she was paid to perform." Id. at 716.

      As in Chavez-Rodriguez, the Court concludes that Plaintiff's speech regarding the

Hispanic population of the Detention Center was made pursuant to his official duties as

Detention Center Administrator. These statements were made at public meetings in

which Plaintiff attempted to raise support among the public for a bond that would fund a

new jail addition. As stated in Plaintiff's affidavit, the jail addition would directly impact

the quality of the facility and its ability to provide "adequate classification for inmates."

Because Plaintiff was responsible for the administration of the Detention Center and its

compliance with known and accepted standard, [see Doc. 75-1 at 6], Plaintiff's speech

regarding the jail addition and the size of the Hispanic inmate population of the Detention

Center contributed to or facilitated his performance as Director. Thus, Plaintiff's speech

was made pursuant to his official duties, even if it was not a part of his everyday

functions.

v.     *Attempts to Redress Overcrowding*

      The Court next addresses whether Plaintiff's attempts to redress overcrowding

were protected by the First Amendment. The details surrounding Plaintiff's comments

on overcrowding at the Curry County Detention Center are unclear. In his affidavit,

Plaintiff avers the following:

> On January 10th, 2012 I gave an interview to Channel 7 from
> Amarillo, Texas (Kyndal Lee).  Ms. Lee asked about my
> impressions about the Curry County jail.  I said publicly that
> based on my experience, there were too many people
> confined in the Curry County Detention Center.  This
> interview was not part of my usual employment with Curry
> County.  This interview was aired on Channel 7 on January
> 11th, 2012 and can be viewed on the internet. . . . I was
> making these comments as a citizen not as an employee of
> Curry County.  I repeated these same statements in various
> forums between February, 2012 and January, 2013.[2]

[Doc. 80 at 4-5]  Plaintiff in his affidavit and Defendants in their reply brief both have

invited the Court to view the interview at

www.connectamarillo.com/news/story.aspx?id=706008.  [Id.; see also Doc. 144 at 52]  A

news article about the interview, entitled "New Administrator named for Curry County

jail," can be found in the record.  [See Doc. 83, Ex. 1C]  The article provides, in relevant

part, as follow:

> Gerry Billy was named the new administrator at Tuesday's
> Curry County Commission meeting.
>
> * * *
>
> Billy said assessing the facility will be his first item of
> business.
>
>  "Operational issues may include matching policy to
> practice—are they really doing what they say they are doing,
> does there need to be changes in staffing levels or patterns?
>
> He also plans to inspect the physical restrictions of the
> facility.

_____

[2] Additionally, Plaintiff made comments regarding overcrowding at the public meetings he attended in February and March 2012 regarding the passage of a bond issue for the Detention Center.  [Doc. 80 at 6]  For the reasons explained above in the section addressing Plaintiff's comments about the Hispanic population, the Court concludes that these comments were made during the course of his official duties and, therefore, were not protected by the First Amendment.

> Billy met with county officials Tuesday afternoon to address
> his concern about the number of inmates.  According to him,
> there are nearly 260 inmates in the jail.  He feels that number
> is high considering the population of Curry County is about
> 48,000.
>
> Though it will be a lot of work, Billy stated that he is looking
> forward to the challenge.

[Doc. 83, Ex. 1C]  Plaintiff contends that these comments were not made during the

course of his official duties, because he did not assume his official duties as Detention

Center Administrator until February 1, 2012.  [Doc. 79 at 35]

The following additional facts are necessary to resolve this claim.  Plaintiff's

employment contract is dated January 10, 2012 and it specifies that "[t]he term of

agreement shall be one (1) year, commencing on February 1, 2012 and running through

midnight January 31, 2013."  [Doc. 75-1 at 9]  However, the contract further provides as

follows:

> Billy has agreed that he will be on call/providing consulting
> services to County during the calendar month of January,
> 2012.  In that regard, Billy will be in the Clovis area January
> 10-13, 2012.  Any consulting services provided by Billy shall
> be compensated at the rate of $40.38 per hour and Billy is to
> submit detailed, itemized invoices setting forth the dates,
> times and a brief description of his services to the Chairman
> of the Curry County Board of County Commissioners.

[Doc. 75-1 at 10]  Indeed, Plaintiff worked as a private consultant "[b]etween January

10th, 2012 and January 31, 2012" "in preparation for [his] full time employment" as

Detention Center Administrator.  [Doc. 80 at 4]  Therefore, on January 10, 2012, Plaintiff

was an independent contractor of Curry County, rather than an employee.  See UJI 13-

404 ("An independent contractor is one who agrees to do certain work where the person

who engages the contractor may direct the result to be accomplished but does not have the right to control the manner in which the details of the work are to be performed.").

In Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr, 518 U.S. 668, 670 (1996), the United States Supreme Court addressed "whether, and to what extent, the First Amendment protects independent contractors from the termination of at-will government contracts in retaliation for their exercise of the freedom of speech." The Court determined that there is no "difference of constitutional magnitude . . . between independent contractors and employees." Id. at 684 (internal quotation marks and citation omitted). The Court reasoned that "[i]ndependent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically—though not always—somewhat less strong in the independent contractor case." Id. Therefore, "the same form of balancing analysis should apply to each." Id. at 685; see Hogan v. Utah Telecommunication Open Infrastructure Agency, No. 13-4069 and 13-4073, 2014 WL 1798470 at *1 (10th Cir. May 7, 2014) (noting that "the First Amendment does not protect public employees or contractors from the consequences of what they say in the course of their official duties" (emphasis added)) (unpublished opinion).

With respect to the question of whether Plaintiff's comments regarding overcrowding were made pursuant to Plaintiff's official duties, the Court notes that Plaintiff's employment contract specified that "[a]ny news releases on matters pertaining to the security or operational activities of the Curry County Detention Center shall be directed by Mr. Billy after consultation with the Curry County Manager." [Doc. 75-1 at

7] Although Plaintiff had not yet assumed his duties as Detention Center Administrator, the purpose of the interview was to introduce Plaintiff to the public as the new Detention Center Administrator and to highlight the challenges that Plaintiff will face in this position.  One of those challenges was overcrowding and the article notes that Plaintiff met with the Commissioners to address his concerns regarding overcrowding.  It is unclear whether Plaintiff's concerns regarding overcrowding were articulated as Detention Administrator-to-be or as a private consultant to the Board on jail policies, but either way, it is apparent that the comments were made in the course of Plaintiff's official duties, rather than as a private citizen.  Accordingly, the Court concludes that Plaintiff's statements regarding overcrowding are not protected by the First Amendment.

vi.     *Plaintiff's Request for a Study Regarding "Sick Building Syndrome"*

Lastly, Plaintiff alleges that his employment contract was terminated in retaliation for his request for a study to determine whether the Detention Center was suffering from "sick building syndrome."  The following additional facts are undisputed for purposes of the present motion for summary judgment:

35.     On August 2, 2012, Plaintiff wrote an email to the County Manager complaining that he and some of his staff had been sick, asking about what procedure he needed to take to have the HVAC system checked for air quality.

36.     Following was a series of emails regarding maintenance of the HVAC system, and acknowledgment of resolution of the matter.

37.     Plaintiff stated in his deposition that comments he made in an email regarding the possibility of the detention center being a "sick building" were made as part of his job duties.

> 38.    Plaintiff's contract requires him to perform investigation concerning employee and other facility complaints.

[Doc. 75 at 8-9 (citations omitted); see Doc. 75-1, Ex. 1E]. Because it is undisputed that Plaintiff's request for a study regarding "sick building syndrome" was made as a part of his job duties as Detention Center Administrator, the Court concludes that Plaintiff's speech was not protected by the First Amendment.

2.    *Public Concern*

Having determined that Plaintiff's objection to being placed under the supervision of Mr. Pyle was not made pursuant to Plaintiff's official duties, the Court next addresses whether it involved a matter of public concern. As a preliminary matter, the Court notes that during his deposition Plaintiff was asked whether he agreed that the "concerns" that he had about "possibly being placed under County Manager Pyle, as [his] supervisor, those are not a matter of public concern, those are matters pertinent to your personal employment situation." [Doc. 75-2 at 9, Ex. 7] Plaintiff responded "Yes sir. It was never a matter of concern until October." [Id.]

"Media publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern." Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1233 (10th Cir. 1998). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane, 134 S.Ct. at 2380 (internal quotation marks and citation omitted). "The inquiry turns on the content, form, and

context of the speech." Id. "The pertinent inquiry is whether plaintiff spoke as a citizen or an employee." Lancaster, 149 F.3d at 1233.

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Id. (internal quotation marks and citation omitted).

In Morris v. City of Colorado Springs, 666 F.3d 654, 661 (10th Cir. 2012), the Tenth Circuit Court of Appeals noted that "to arrive at the crux of the public concern content inquiry" the Court must "focus on what is actually said on the topic." (internal quotation marks and citation omitted). In Morris, the plaintiff alleged that she was fired in retaliation for submitting a Notice of Claim to the hospital in which she was employed. The Notice of Claim "gave notice to the City of Colorado Springs and Dr. Mahan that she would be seeking recovery for 'economic loss, humiliation, and emotional distress' as a result of Dr. Mahan's commission of 'various torts, including . . . outrageous conduct and battery.'" Id. at 661-62. The Court noted that "[t]his document is clearly framed to provide notice of potential claims she would bring against the hospital and Dr. Mahan arising out of her own working conditions." Id. (emphasis in original). "That is, 'what [was] actually said in her allegations concerned essentially a personal dispute or grievance." Id. at 662 (internal quotation marks and citation omitted). Therefore, the Court held that "[t]he content of the notice does not pertain to a matter of public concern on its face." Id. In arriving at its conclusion, the Court acknowledged that the incident

40

that formed the basis for the plaintiff's complaint had been "the subject of a great deal of

media coverage."  Id. at 662-63.  "However, [a] statement does not attain the status of

public concern simply because its *subject matter* could, in different circumstances, have

been the topic of a communication to the public that might be of general interest."  Id.

(internal quotation marks and citation omitted) (emphasis in original).

> Thus, the fact that the incident mentioned in her petition
> gained public interest does not mean that the petition itself
> was framed in a manner calculated to ignite the public
> interest.  "The right of a public employee [to petition] . . . is
> not a right to transform everyday employment disputes into
> matters for constitutional litigation."  Guarnieri, 131 S. Ct. at
> 2501.  Ms. Morris' notice is framed as lodging a complaint
> regarding an employment dispute, and seeking damages for it.
> It does nothing more.  Because the notice "as alleged" was
> not a matter of public concern, Leverington, 643, F.3d at 728,
> the district court properly dismissed Ms. Morris's first claim.

Id. at 663.

Turning to what was actually said in the present case, Plaintiff's letter to Attorney

Doerr alleged that placing Plaintiff under the supervision of Mr. Pyle would be a "Breach

of Contract by Board of County Commissioners for Curry County."  [Doc. 75-7]

Plaintiff demanded that Defendants "comply with the letter and spirit of the contract

**immediately**" or Plaintiff would be advised "of his further legal rights to pursue a claim

of breach of contract."  [Doc. 75-7 (emphasis in original)]  Like the Notice of Claim at

issue in Morris, Plaintiff's letter was "clearly framed to provide notice of potential

claims" arising out of his own working conditions."  Id. at 662.  Although a change in

supervision for the Detention Center Administrator might, in the abstract, be a matter of

public concern, Plaintiff's letter to Attorney Doerr was not "framed in a manner

calculated to ignite the public interest." Id. at 663. Rather, Plaintiff's letter concerned a personal dispute or grievance and "[s]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." Id. at 661. Accordingly, the Court concludes that Plaintiff's letter did not involve a matter of public concern and, therefore, was not protected by the First Amendment.

Because Plaintiff's speech was made in the course of his official duties and/or did not address matters of public concern, Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim will be granted.

E.     *Whistleblower Protection Act*

Plaintiff's Whistleblower Protection Act (the Act) claim is premised on the speech that he alleges is protected by the First Amendment, as well as his alleged failure "to take retaliatory action against a Detention Center employee for union organization." [Doc. 79 at 38] Defendants contend that they are entitled to summary judgment on this claim because: (1) the Act does not protect disclosures made during the course of an employee's normal job duties; (2) "[o]ne cannot possibly have protection under the Act for 'protesting' an action that never took place" and Plaintiff was never placed under the supervision of Mr. Pyle; [Doc. 75 at 31]; (3) Plaintiff's request for an investigation into Commissioner Sandoval's comments was not a "communication" under the Act because it did not reveal any wrongdoing; and (4) Plaintiff's speech did not pertain to an "unlawful or improper act" as defined by the Act. [Doc. 75]

The Act provides as follows:

> A public employer shall not take any retaliatory action against
> a public employee because the public employee:
>
> A. communicates to the public employer or a third party
> information about an action or a failure to act that the public
> employee believes in good faith constitutes an unlawful or
> improper act;
>
> B. provides information to, or testifies before, a public body
> as part of an investigation, hearing or inquiry into an unlawful
> or improper act; or
>
> C. objects to or refuses to participate in an activity, policy or
> practice that constitutes an unlawful or improper act.

NMSA 1978, § 10-16C-3.  An "unlawful or improper act" is defined as:

> a practice, procedure, action or failure to act on the part of a
> public employer that:
>
> (1) violates a federal law, a federal regulation, a state law, a
> state administrative rule or a law of any political subdivision
> of the state;
>
> (2) constitutes malfeasance in public office; or
>
> (3) constitutes gross mismanagement, a waste of funds, an
> abuse of authority or a substantial and specific danger to the
> public.

NMSA 1978, § 10-16-2(E).  Given the recent enactment of the Whistleblower Protection

Act, it is not surprising that there is only one New Mexico appellate court case construing

the contours of the Act.  See Janet v. Marshall, 296 P.3d 1253 (N.M. App. 2012)

(construing the term "public employer" in the Whistleblower Protection Act).

There is no allegation or evidence that the parties' citizenship is diverse, rather

Plaintiff's state law claims are before this Court only by virtue of the supplemental

jurisdiction conferred by 28 U.S.C. § 1367(a).  However, 28 U.S.C. § 1367(c)(1)

provides that "[t]he district courts may decline to exercise supplemental jurisdiction over

43

a claim . . . [if] the claim raises a novel or complex issue of State law." § 1367(c)(1). "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." Thatcher Enter. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)).

The question of whether the Whistleblower Protection Act protects communications made during the normal course of an employee's duties, whether it protects an employee for protesting an action that never took place, and whether Plaintiff's speech was a "communication" that pertained to "an unlawful or improper act" as those terms are defined by the Act are all novel and complex questions of state law. As such, this Court will decline to exercise jurisdiction over Plaintiff's Whistleblower Protection Act claim under 28 U.S.C. § 1367(c)(1). See Merrifield v. Bd. of County Com'rs for County of Santa Fe, 654 F.3d 1073, 1085 (10th Cir. 2011) (affirming the district court's decision to decline to exercise jurisdiction over the plaintiff's state law claim because "the principal issue in the state-law claim—the standard of review that the hearing officer should have applied—is 'a novel ... issue of State law'"); Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1237 (10th Cir. 1997) (affirming the district court's decision to decline to exercise jurisdiction over the plaintiff's state law claim because it "raise[d] a novel and complex issue of state law that is undecided by the Colorado courts and there are other compelling reasons for declining to exercise supplemental jurisdiction since this delicate privacy law area is in transition"); Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995) (affirming the

district court's decision to decline to exercise jurisdiction of the plaintiff's state law claim because "the Kansas courts are the appropriate forum to decide this novel and complex issue of state law").

## IV.   CONCLUSION

For the foregoing reason, the Court will grant *Defendants' Motion for Summary Judgment* [Doc. 74] with respect to Plaintiff's breach of contract, due process property interest, due process liberty interest, and first amendment retaliation claims, but deny Defendants' motion with respect to Plaintiff's Whistleblower Protection Act claim. However, the Court declines to exercise supplemental jurisdiction over Plaintiff's Whistleblower Protection Act claim and, therefore, dismisses this claim without prejudice.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 74] is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that Plaintiff's Whistleblower Protection Act claim is dismissed without prejudice.

**SO ORDERED** this 30th day of September, 2014 in Albuquerque, New Mexico.


_____
**M. CHRISTINA ARMIJO**
Chief United States District Judge